Lori C. Rogich, Esq.
Nevada State Bar No. 12272
ROGICH LAW FIRM, PLLC
11920 Southern Highlands Parkway, Suite 301
Las Vegas, Nevada 89141
Telephone: (702) 279-2491
rogichlasvegas@aim.com
Attorney for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| O.R., BY AND THROUGH HER PARENTS, SIG AND LORI ROGICH AND SIG AND LORI ROGICH, INDIVIDUALLY,<br><br>Plaintiffs<br><br>v.<br><br>CLARK COUNTY SCHOOL DISTRICT,<br><br>Defendant | Case No.: 2:17-cv-01541<br><br>**COMPLAINT** |

**A.    INTRODUCTION**

1.      This action arises under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.* ("IDEA"), Title II of Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.* ("ADA") and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"). This is an appeal from the decision, dated March 8, 2017, of the Decision on Appeal by the Nevada State Review Officer ("*SRO Dec.*"), attached as Exhibit 1. The SRO reversed a decision of Independent Hearing Officer, dated November 14, 2016 ("*IHO Dec.*"), attached as Exhibit 2. The IHO determined that Plaintiffs Sig and Lori Rogich ("Parents") had demonstrated the failure of the Clark County School District ("District" or "Clark County") to provide a free appropriate public education ("FAPE") to O.R. and were therefore entitled to tuition and

1

transportation reimbursement for June 2014, the 2014-2015, 2015-2016 and 2016-2017 school years. *IHO Dec.* at 31.

2. In June 2014, the District proposed an Individualized Educational Program ("IEP") that failed to take into account and address O.R.'s needs as identified in her most recent evaluations and did not offer a free, appropriate public education. The District next proposed an IEP in May 2016 that failed to take into account and address O.R.'s needs as identified in her most recent evaluations and did not offer a free, appropriate public education.

**B.     JURISDICTION AND VENUE**

3. Jurisdiction is based upon 28 U.S.C. § 1331, as this action arises under the Constitution and laws of the United States. Jurisdiction is also based upon IDEA, 20 U.S.C. §§ 1415(i)(2), (i)(3)(A), (i)(3)(B)(i)(I), ADA, 42 U.S.C. §12133 and Section 504, 29 U.S.C. § 794(a).

4. Plaintiffs have fully exhausted their administrative remedies as required by the IDEA, 20 U.S.C. § 1415(f) and (g).

5. This civil action is timely filed under 20 U.S.C. §1415(i)(2)(B), as the decision of the State Review Officer was rendered on March 8, 2017, and this action is filed within 90 days of that decision. Nevada state law contains no explicit time limitation for bringing such an action.

6. Venue in this district is proper under 28 U.S.C. § 1391(b). All parties are resident in or maintain offices in Clark County, Nevada, within the District of Nevada.

**III.    PARTIES**

7. O.R. was born in 2002. She lives with her Parents, within the boundaries of the Clark County School District.

8. Plaintiffs, Sig and Lori Rogich are residents of Las Vegas, Clark County, in the State of Nevada.

9. Throughout her education, O.R. has been eligible for special education and related services under the IDEA, and no party disputes her eligibility for these services. Comprehensive psychoeducational evaluations, conducted in 2009 and 2013, resulted in the following diagnoses, among others, for O.R.: Learning Disorder NOS (Nonverbal Learning Disorder-NLD; Reading Disorder (Developmental Dyslexia); Mathematics Disorder; Disorder of Written Expression; Generalized Anxiety Disorder. She also has medical conditions that impact her ability to learn. Therefore, she has impairments that substantially limit her in major life activities, and thus is entitled to the protections of Section 504 and the ADA.

10. Clark County School District is a Local Education Agency with its offices at 5100 W. Sahara Avenue, Las Vegas, Nevada 89146. The District is responsible for providing special education and related services to all eligible children within its borders. It is responsible for honoring the substantive and procedural rights of eligible children and their parents under the IDEA, Section 504 and the ADA.

11. The District is a recipient of federal financial assistance.

12. The District is a public entity responsible for compliance with the guarantees of the ADA.

## IV.   PROCEDURAL HISTORY

13. On May 26, 2016, the District received a Due Process Complaint ("DPC") challenging the appropriateness of a May 27, 2014 IEP, filed on behalf of O.R. *IHO Dec.* at 1. The IHO denied the District's motion to dismiss the complaint on statute of limitation grounds

when she found that the facsimile transmissions and the District's "received" stamps indicated that the District received the DPC on May 26, 2016. *Id.*

14. At a Prehearing Conference on September 29, 2016, the parties stipulated to amend the DPC to challenge the appropriateness of the IEP offered on June 8, 2016.

15. On October 4, 2016, Parents filed a Motion to Compel Discovery asking for program descriptions and methodologies proposed for O.R. or that may be otherwise relevant to this matter. The IHO denied the Motion, holding that if the 2016 IEP had identified a specific reading program, then Parents would be entitled to the information. Because the IEP identified no such program(s), Parents were not entitled to the information.

## V.     THE LEGAL FRAMEWORK

### A. IDEA

16. "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas County Sch. Dist. RE*-1, No. 15-827, slip op. at 11.

17. "In determining what it means to 'meet the unique needs' of a child with a disability, the provisions governing the IEP development process are a natural source of guidance: It is through the IEP that '[t]he [FAPE] required by the Act is tailored to the unique needs of' a particular child." *Id.* at 13 (citation omitted). IDEA's provisions do not impose only procedural requirements, or a checklist of items the IEP must address. *Id.* The requirements "are there for a reason and their focus provides insight into what it means, for purposes of the FAPE definition, to 'meet the unique needs' of a child with a disability." *Id.* (citing 20 U.S.C. § 1401(9),(29)).

18. IDEA contemplates that the fact-intensive exercise of developing an IEP "will be informed not only by the expertise of school officials but also by the input of the child's parents." *Id.* at 11. Procedures that provide for meaningful parental participation are particularly important. *M.C. v. Antelope Valley Union High Sch. Dist.*, No. 14-56344, 2017 U.S. App. LEXIS 5347, at *4 (9th Cir. March 27, 2017).

19. The requirements for an appropriate IEP include:

   a. "It is constructed *only after* careful consideration of the child's present levels of achievement, disability, and potential for growth." *Id.* at 12 (citing 20 U.S.C. §§ 1414(d)(1)(A)(i)(I)-(IV), (d)(3)(A)(i)-(iv)) (emphasis supplied).

   b. Every IEP must begin with an accurate description of the child's present level of achievement, including explaining "how the child's disability affects the child's involvement and progress in the general education curriculum." *Id.* at 13 (citing 20 U.S.C. § 1414(d)(1)(A)(i)(I)(aa)).

   c. The IEP then sets out "measurable annual goals" designed to enable the child to be involved in and make progress in the general education curriculum. *Id.* (citing 20 U.S.C. § 1414(d)(1)(A)(i)(II), (IV)).

   d. The school district must conduct periodic evaluations that assess the child in all areas of suspected disability; are "sufficiently comprehensive to identify all of the child's special education and related service needs," and provide "relevant information that directly assists" in determining the child's educational needs. 20 U.S.C. §§ 1414(a)(1)(C)(i)(II), 1414(a)(2)(A), 1414(b)(2)(A)(ii), 1414(b)(3)(B); 34 C.F.R. §§300.304(c)(1)(ii—iv), (2), (4), (6), (7).

   e. The school district must provide services (including specially designed instruction, supplementary aids and services, program modifications and supports for school personnel, based on peer-reviewed research to the extent practicable) that enable the student to advance appropriately toward attaining meaningful annual goals, to be involved in and progress in the general education curriculum and to participate in extracurricular and nonacademic activities. 20 U.S.C. §§ 1414(d)(1)(A)(i)(IV), 1414(d)(3).

   f. The school district must plan for the student to make reasonable progress toward the goals in the student's IEP, and, if the student fails to make reasonable progress, must make changes in the goals or the services in the

IEP to enable the student to make progress.  20 U.S.C. §§ 1414(c)(1)(B), 1414(d)(4); 34 C.F.R. § 300.324.

20. "The IEP must aim to enable the student to make progress. After all, the essential function of an IEP is to set out a plan for pursuing academic and functional advancement. See 20 U.S.C. § 1414(d)(1)(A)(i)(I)-(IV). . . A substantive standard not focused on student progress would do little to remedy the pervasive and tragic academic stagnation that prompted Congress to act." *Endrew F.*, slip op. at 11.

21. The progress contemplated by the IEP must be "appropriate in light of the child's circumstances." *Id.* at 12, 15. If it is not a reasonable prospect for a child to achieve on grade level without a modified curriculum, "his educational program must be appropriately ambitious in light of his circumstances, just as advancement from grade to grade is appropriately ambitious for most children. . . .The goals may differ, but every child should have the chance to meet challenging objectives." *Id.* at 14.

22. In reviewing an IEP, hearing officers and courts defer to school authorities "based on the application of expertise and the exercise of judgment." *Endrew F.*, slip op. at 16. "By the time any dispute reaches court, school authorities will have had a complete opportunity to bring their expertise and judgment to bear on areas of disagreement. A reviewing court may fairly expect those authorities to be able to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to make progress appropriate in light of his circumstances." *Id.*

**B. SECTION 504 AND THE ADA**

23. Section 504 and the ADA prohibit school districts such as Clark County from discriminating on the basis of disability.

6

24.     Section 504 requires "the provision of an appropriate education" to students with disabilities. An appropriate education under Section 504 "is the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons as adequately as the needs of non handicapped persons are met and (ii) are based upon adherence to procedures that satisfy the requirements of §§ 104.34, 104.35, and 104.36." 34 C.F.R. § 104.33(b).

25.     Section 504 "is broader than the IDEA; it is concerned with discrimination in the provision of state services to all individuals with disabilities." *A.G. v. Paradise Valley Unified Sch. Dist.*, 815 F.3d 1195, 1203 (9th Cir. 2016).

26.     A school district violates Section 504 and the ADA if it denies a qualified individual with a disability a reasonable accommodation that the individual needs in order to enjoy meaningful access to the benefits of public services.

27.     It is a denial of reasonable accommodation and a violation of the ADA and Section 504 if (1) a student needs disability-specific services to enjoy meaningful access to the benefits of a public education, (2) a school district was on notice that the [student] needed those disability-specific services, but did not provide those services, and (3) disability-specific services were available as a reasonable accommodation. *Mark H. v. Hamamoto*, 620 F.3d 1090, 1097 (9th Cir. 2010).

## VI.    STANDARD OF REVIEW

28.     "Judicial review in IDEA cases 'differs substantially from judicial review of other agency actions, in which courts are generally confined to the administrative record and are held to a highly differential standard of review." *M.C. v. Antelope Valley Union High Sch. Dist.*, No.

14-56344, 2017 U.S. App. LEXIS 5347, at *3 (9th Cir. March 27, 2017) (quoting *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1471 (9th Cir. 1993)).

29. Federal courts review whether the state has provided a FAPE *de novo*. *Id.*

30. Federal courts afford some deference to the administrative fact finder when the decision below is "thorough and careful." *Id.* In a state where there is a second tier administrative hearing officer, such as the SRO in this case, federal courts defer to the SRO *unless* the SRO overturns the credibility determinations of the hearing officer. *Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877, 888-889 (9th Cir. 2001).

## VII.   FACTS

31. In 2007, the District determined that O.R. was eligible for special education and related services under the category "Other Health Impairment." *IHO Dec.* at 6, FF 1; *SRO Dec.* at 5.

32. O.R. attended the District kindergarten program for most of the 2008-2009 school year, until Parents enrolled her in a private school. *IHO Dec.* at 6, FF 2; *SRO Dec.* at 5.

33. In December 2009 and March 2013, Pettigru Counseling Associates evaluated O.R. The District presented no testimony challenging the accuracy of any assessment admitted into evidence. *IHO Dec.* at 6-7, FF 3.

34. The March 2013 evaluation listed the following diagnoses for O.R.: Learning Disorder NOA (Nonverbal Learning Disorder-NLD); Reading Disorder (Developmental Dyslexia); Mathematics Disorder; Disorder of Written Expression; Generalized Anxiety Disorder; Dysthymic Disorder; Developmental Coordination Disorder (in partial remission); Mixed Receptive-Expressive Language Disorder (in partial remission); Phonological Disorder (in remission). *IHO Dec.* at 7, FF 4.

35. In light of O.R.'s nonverbal learning disorder and the myriad of other disorders listed in the previous paragraph, the 2013 evaluation indicated that O.R. requires a specific teaching methodology to receive an appropriate education. *IHO Dec.* at 7, FF 5.

36. After listening to the witnesses, assessing their credibility, and reviewing the evidence, the IHO found that the recommendations in the 2009 and 2013 assessments were "comprehensive, addressing [O.R.'s] psychological, educational and social needs." *IHO Dec.* at 8, FF 9.

37. Parents provided the Pettigru assessment to the District in January 2014. After completing its own evaluation, the District proposed an IEP in May 2014.

38. Regarding the May 2014 IEP, the IHO found:

  a. The one reading comprehension goal in the IEP was contrary to the recommendations in the comprehensive Pettigru assessment. *IHO Dec.* at 8-9, FF 10A.

  b. The IEP reflects that Parents requested teachers trained in Orton-Gillingham methodologies and placement in a private school until the training is completed. The basis of its rejection of this request on the fact that the "IEP includes salient components from Orton-Gillingham in the accommodations/modifications and goals to provide a multi-sensory approach." *IHO Dec.* at 9, FF 10F.

  c. Based on credibility assessments related to the testimony of the Early Childhood Teacher and Child Find Administrator, who met O.R. for ten minutes in 2014, the IHO determined that the District had access to O.R.'s assessments and school reports for the development of the 2014 IEP, but failed to give them due weight. *IHO Dec.* at 9, FF 11.

  d. The Early Childhood Teacher "did not demonstrate an understanding of [O.R.'s] unique academic needs as set forth in the Assessments that were available to the District." *IHO Dec.* at 10, FF 13.

  e. The District's school psychologist "conceded that [O.R.] needed a multi-sensory program but would not name a program(s) the District used. *IHO Dec.* at 10, FF 14 The IHO rejected the school psychologist's complaint that the IEP Team did not receive data for programming as not credible, in light of the documentation provided by Parents. *IHO Dec.* at 10, FF 15.

    f. The IHO rejected as not credible the Compliance Monitor's testimony that the District did not have O.R.'s present levels of functioning in 2014, in light of the documentation provided by Parents. *IHO Dec.* at 11, FF 18, 19, 20.

    g. The IHO found that Parents' witness, a pediatric neuropsychologist, was credible. *IHO Dec.* at 11, FF 21, 22.

    h. The IHO found his analysis of the 2014 IEP relevant and accepted his expert opinion on the appropriateness of that IEP. *IHO Dec.* at 11-12, FF 23.

    i. Based upon her assessment of the witnesses who testified, the IHO found that "the District predetermined that under no circumstances would a methodology be put into" O.R.'s IEP. *IHO Dec.* at 12, FF 25.

    j. Parents provided the requisite ten-day notice of disagreement with the IEP and intention of the right to seek reimbursement. *IHO Dec.* at 12, FF 26.

39. Regarding the June 2016 IEP, the IHO found:

    a. The District's Transition Specialist became familiar with O.R. when she learned that there was a new report to review. *IHO Dec.* at 13, FF 28.

    b. The IHO credited the Transition Specialist's explanation for the delay of the IEP meeting until May 2016. *IHO Dec.* at 13, FF 29.

    c. The Transition Specialist reviewed the private neuropsychologist's report. *Id.*

    d. The private neuropsychologist, like the previous evaluators, recommended the Orton-Gillingham multi-modal approach for all subjects, not just reading. *IHO Dec.* at 13-14, FF 32.

    e. The IHO concluded that the District witnesses did not demonstrate a working knowledge of Orton-Gillingham, the methodology recommended for O.R. *IHO Dec.* at 14, FF 33.

    f. The IHO did not find the Special Education Teacher who testified to be credible. She did find the private neuropsychologist to be credible. *IHO Dec.* at 14, FF 36.

    g. Parents cooperated in developing the IEP. Parents gave timely notice in the beginning of May 2016 of their intention to place privately and seek

        reimbursement. They participated in IEP meetings on May 19 and May 27, 2016. *Id.*

    h. The goals and benchmarks in the 2016 IEP provide "evidence that the [Parent provided] assessments were not considered" in the IEPs development. *IHO Dec.* at 15, FF 38D.

40. The IHO granted a motion *in limine* filed by Parents and precluded the District from presenting witnesses who could testify about available reading programs within the District. Prior to the hearing, the District had resisted producing information about available reading programs and the Hearing Officer did not compel disclosure, finding that the IEP did not identify any particular reading program. In light of the District's position that Parents were not entitled to information about available methodologies, the IHO correctly precluded this testimony.

41. The SRO erred in relying upon the testimony regarding available methodologies within the District, at the appeal stage, of two witnesses, for the following reasons:

    a. The SRO erred in reversing the IHO's order precluding witnesses from testifying. As the Court recognized in *Endrew F.*, "[b]y the time any dispute reaches court, school authorities will have had a complete opportunity to bring their expertise and judgment to bear on areas of disagreement." *Slip op.* at 16. Having refused to offer a cogent and responsive explanation to parents of available methodologies during the IEP process, the District was not entitled to present evidence on those methodologies at the hearing.

    b. The two witnesses offered inconsistent testimony.
        1) The Special Education Director of Silvestri Middle School testified that:

            a. "Read 180 would have addressed her deficits in reading, fluency and comprehension, vocabulary and writing through the structures that that program." Tr. 02/06/17 (relevant excerpts attached as Exhibit 3) at pp. 15-16 .

            b. "Touch Math has instruction from counting, addition, subtraction, up to some higher order skills, such as pre-algebra. It covers math and time. And areas in which she

    need support was in addition, word problems, money and some counting." Tr. 02/06/17 at p. 21.

  c. The programs are research-based because "per law we were unable to utilize programs within the district that were not research base, programs were vetted through the curriculum department in order to be used District-wide and within classrooms. Compare Tr. 02/06/17 at pp. 15-16 to p. 18:24-19:3.

  d. While the district has "done significant training for teachers in implementing the Read 180 program", she did not know who would be teaching O.R. She also did not know whether all of the teachers were trained in Touch Math as well. See Tr. 02/06/17 at p. 66-67. She "could not specifically state how much training they did or did not receive". Id. at 67: 22-68:2.

2) The Director of Professional Development with Student Support Services, on the other hand testified to the following:

  a. "I wouldn't probably think she would need Read 180 because those areas are in normal range. I think she needs not so much a program but direct instruction in reading, in fluency, comprehension." Tr. 02/06/17 at p. 118.

  b. "I do not believe she needed a [research based program", a purchased program. I think she needed specially designed instruction to help her in those areas." Id. at 118: 20-119:1.

  c. "Teachers have a variety of training. So everybody who has a teacher license has like a reading course. In Clark County we have long-term subs. So they typically have two years of college." She continued: "We offer professional development as a regular course because we have a lot of staff with varying experiences. So if a teacher needs more training, then as a school District, we get that training to the person. But I don't know her teachers specifically she would have been assigned to. She continued: "[Long term subs} are all over the Valley. There's been a teacher, special education teacher shortage since as long as I've been around." Id. at 119: 4 – 120:1.

  d. "There are again other approaches, Touch Math, I'm probably not going to recommend because kids get too

> dependent on the touch points, and there are some approaches that work more on being proficient fluent again." Tr. 02/06/17 at p. 124: 13-21.

42. When an SRO's decision is inadequately reasoned, and it conflicts with a better-reasoned IHO opinion, federal courts should defer to the IHO. *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012). In this case, this Court should rely upon the IHO opinion because the SRO's decision reversing the IHO is not thorough and careful for the following reasons:

   a. The IHO determined that school employees did not consider evaluations provided by the parents. This is a credibility determination of the District witnesses. The SRO heard no live testimony relating to this area of dispute. She only heard testimony regarding methodologies available in the District. The SRO points to nothing in the record to support her decision to reverse the IHO's credibility determination that school officials failed to consider the private evaluations. Further, the failure to consider recent evaluative data constitutes a serious violation of IDEA's procedures.

   b. The SRO erred in relying upon retrospective testimony about what methodologies could have been implemented, when the parents had no way of knowing, when they made their placement decision, what techniques would be used. *See R.E.*, 694 F.3d at 193-194 (because SRO's reliance on teacher's retrospective testimony inappropriate and IHO's decision sufficiently supported, federal court deferred to IHO determination that IEP did not offer FAPE).

   c. The SRO erred in discounting the private neuropsychologist's testimony, in part, based on the fact that he "was not familiar with programs available in the District." *SRO Dec.* at 42. The private neuropsychologist lacked familiarity with the programs that would be implemented because the IEP did not specify any particular program and the District had failed to offer "a cogent and responsive explanation for their decisions" that showed that the IEPs were "reasonably calculated to enable [O.R.] to make progress appropriate in light of the circumstances." *Endrew F.*, slip op. at 16. It was error to allow the District to fail to provide information and then fault the neuropsychologist for not considering that information.

   d. The SRO decision to reverse the IHO's ruling that the goals and objectives were not appropriate was not thorough and careful. The IHO correctly found that the objectives were contrary to the Pettigru recommendations. *IHO Dec.* at 8-9. The SRO states, in a conclusory manner, that the Pettigru report contained "no contrary recommendations." However, the Pettigru

report makes 29 separate recommendations that thoroughly address the type of instruction and instructional strategies that O.R. requires to perform her best and make cognitive and academic gains.

e. The SRO erred in reversing the IHO's determination that the District had not provided sufficient supervision for the social skills goals. *SRO Dec.* at 49. After listening to the testimony of the District's Transition Specialist, making credibility determinations based upon that testimony, and reviewing the IEPs that did not provide explicitly for supervision and guidance by an adult in all classes, the IHO correctly determined that O.R. would not receive sufficient supervision and guidance in "specials" that were general education classes. *See IHO Dec.* at 16. There is nothing in the record to support the SRO's reversal of this finding.

f. The SRO erred in reversing the IHO's determination that the Parents' placement was appropriate. The IHO relied upon the Modifications and Accommodations Plan from the private school and the private neuropsychologist's assessment. *IHO Dec.* at 17-18. The evidence established that the methodologies used by the private schools conferred educational benefit, as the testimony proved that she had made meaningful progress both academically and socially. The District elicited no evidence, and the SRO cites none, to the contrary.

## COUNT I
## IDEA
## DENIAL OF FAPE
## All Plaintiffs v. Clark County School District

43. Plaintiffs incorporate the previous paragraphs as if fully set forth herein.

44. The IHO correctly determined that the IEPs at issue denied a FAPE to O.R.

45. The SRO's decision reversing the IHO was not thorough and careful, because the SRO set aside the IHO's credibility determinations in reaching her decision.

46. The SRO's decision reversing the IHO was not thorough and careful, because the SRO supplemented the record with evidence relating to reading programs that were not included in the original IEPs. During the hearing process, when Parents requested information about those reading programs, Clark County refused to provide that information. Having refused to provide

the information during the IEP and hearing process, the District cannot use evidence related to those programs at the SRO level to provide a "cogent and responsive explanation for their decisions." *Endrew F.*, slip op. at 16.

**COUNT II**
**SECTION 504**
**O.R. v. Clark County School District**

47. Plaintiff O.R. incorporates the previous paragraphs as if fully set forth herein.

48. The District has intentionally and purposefully violated the rights of O.R. secured by Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 and 34 C.F.R.§ 104.4 by

    a. denying O.R. the opportunity to participate in and benefit from federally assisted regular education services, programs and activities, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(a)(b)(I);

    b. failing to provide O.R. an opportunity to participate in and benefit from education and related services that is at least equal to the opportunity afforded to students without disabilities in violation of 34 C.F.R 104.4(b)(1)(iii), (2).

**COUNT III**
**ADA**
**O.R. v. Clark County School District**

49. Plaintiff O.R. incorporates the previous paragraphs as if fully set forth herein.

50. The District has intentionally and purposefully violated the rights of O.R. secured by the ADA, 42 U.S.C. § 12131 et seq. and 28 C.F.R. § 35.130, by:

    a. subjecting O.R. to discrimination and retaliation, in violation of 28 C.F.R. § 35.130(a) and 42 U.S.C. §12203;

    b. excluding O.R. from participating in and denying her the benefit of District services, programs, and activities on this basis of her disability, in violation of 28 C.F.R. § 35.130(a);

    c.  denying O.R. the opportunity to participate in and benefit from aids, benefits and services on a basis equal with that afforded others, in violation of 28 C.F.R. § 35.130(b)(1)(ii);

    d.  failing and refusing to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination against O.R., in violation of 28 C.F.R. § 35.130(b)(7);

    e.  limiting O.R. in the enjoyment of rights, privileges, advantages, or opportunities enjoyed by others receiving the aid, benefit, or service, in violation of 28 C.F.R. § 35.130(b)(1)(vii);

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that the Court receive the record of the administrative proceeding and such additional evidence as may be required to render a just decision and award the following relief:

a) Reverse the decision of the SRO and hold that the District did not provide a FAPE to O.R. in violation of the IDEA and Section 504 and discriminated against O.R. in violation of Section 504 and the ADA;

b) Reinstate the IHO's award of tuition and transportation reimbursement to plaintiffs;

c) Award plaintiffs their reasonable attorney's fees and expert witness costs, including the fees and costs incurred in this action;

d) Award such other relief as the Court deems necessary and appropriate.

DATED this 6th day of June, 2017.

ROGICH LAW FIRM, PLLC

/s/ Lori C. Rogich
Lori C. Rogich, Esq., Bar No. 12272
11920 Southern Highlands Parkway
Suite 301
Las Vegas, Nevada 89141
Attorney for Plaintiffs