UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| Rogich et al, | Case No. 2:17-cv-01541-RFB-NJK |
| Plaintiffs, | ORDER |
| v. | |
| Clark County School District, | |
| Defendant. | |

## I.    INTRODUCTION

Before the Court is Plaintiffs' Motion for Judgment on the Administrative Record, as Supplemented (ECF No. 58) and Defendant's Motion for Summary Judgment (ECF No. 59).

## II.    PROCEDURAL BACKGROUND

This is an appeal from the March 8, 2017, Decision on Appeal by the Nevada State Review Officer ("SRO") which reversed the November 14, 2016, decision of the Independent Hearing Officer ("IHO") in which the IHO determined that Plaintiffs had demonstrated Defendant's failure to provide a free appropriate public education ("FAPE") to O.R. as evidenced by the inadequacy of the 2014 and 2016 Individualized Educational Programs ("IEP"), and that Plaintiffs were therefore entitled to tuition and transportation reimbursement for June 2014 and the 2014-2015, 2015-2016, and 2016-2017 school years. ECF No. 1 at 1-2.

Plaintiffs filed the complaint in this Court on June 6, 2017 appealing the decision of the SRO and additionally asserting violations of Section 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act. ECF No. 1. Defendant filed a Motion to Dismiss Counts II and III of the Complaint on June 26, 2017. ECF No. 8. Plaintiffs responded on July 10, 2017;

1    Defendant replied on July 17, 2017. ECF Nos. 10, 11.

2         On January 22, 2018, Plaintiffs filed a Motion for Judgment on the Administrative Record,

3    moving the Court to reverse the decision of the SRO. ECF No. 19. Defendant responded and filed

4    a Cross-Motion for Summary Judgment on February 26, 2018. ECF No. 31. Plaintiffs replied and

5    opposed the cross-motion on March 12, 2018. ECF No. 34. Defendant filed a reply to Plaintiff's

6    opposition to the cross-motion on March 26, 2018. ECF No. 38.

7         Also on January 22, 2018, Plaintiffs filed a Motion for Summary Judgment on Counts II

8    and III of the Complaint. Defendant responded and filed a Cross-Motion for Summary Judgment

9    on Counts II and III of the Complaint on February 26, 2018. ECF No. 32. Plaintiffs replied and

10   opposed the cross-motion on March 12, 2018. ECF No. 35. Defendant filed a reply to Plaintiff's

11   opposition to the cross-motion on March 26, 2018. ECF No. 37.

12        The Court denied the Motion to Dismiss on March 31, 2018. ECF No. 39.

13        A hearing on Plaintiffs' Motions for Judgment on the Administrative Record and for

14   Summary Judgment was held on August 29, 2018. ECF No. 44. At the hearing, the Court ordered

15   that Defendant file a supplement to the argument raised at the hearing by August 31, 2018, while

16   Plaintiffs were to file a supplement to their motions two weeks after. ECF No. 44. The Court also

17   ordered expert testimony regarding the Orton-Gillingham methodology. Id. Defendant filed its

18   Supplemental Response in support of its cross-motions for summary judgment and in accordance

19   with the Court's order on August 31, 2018. ECF No. 45. Defendant file an Errata to its

20   Supplemental Response on September 6, 2018. ECF No. 46. Plaintiffs filed a reply to the Errata

21   on September 20, 2018. ECF No. 50.

22        On September 23, 2018, the Court denied Plaintiff's Motions for Judgment on the

23   Administrative Record and Motion for Summary Judgment on Counts II and III without prejudice,

24   permitting the parties to refile the motions after the forthcoming evidentiary hearing. ECF No. 51.

25        On February 12, 2019, the evidentiary hearing was held, at which Drs. Kelli Sandman-

26   Hurley and Catherine M. Scott testified. ECF No. 56.

27        Plaintiffs filed the instant motion on March 19, 2019. ECF No. 58. Defendant responded

28   on April 2, 2019, then filed an Errata to its response on April 12, 2019. ECF Nos. 64, 65. Plaintiffs

replied on April 16, 2019. ECF No. 66.

Defendant filed the instant motion on March 19, 2019. ECF No. 59. Defendant then filed an Errata to its motion on March 22, 2019. ECF No. 60. Plaintiffs responded on April 2, 2019. ECF No. 63. Defendant replied on April 16, 2019. ECF No. 67.

### III.    FACTUAL FINDINGS

The Court finds the following factual findings based upon the record. O.R. presents with a history of hydrocephalus at birth and multiple developmental delays. Her diagnosed learning disabilities include "Executive Function Deficit; Attention Deficit Hyperactivity Disorder; Developmental Dyslexia; Developmental Mathematics Disorder; a Nonverbal Learning Disorder; Generalized Anxiety Disorder; Dysthymic Disorder; and Mixed Receptive-Expressive Language Disorder.

A multidisciplinary team ("MDT") within the Clark County School District (the "District") initially evaluated O.R. on December 19, 2007 when she was five years old, classified her under the category of "Other Health Impairment," and recommended she attend the ECSE preschool self-contained program for the remainder of the 2007-2008 school year. Id. O.R. was withdrawn from District programming in April 2008.

O.R. was evaluated by Pettigru Counseling Associates in December 2009 and 2013.

O.R. attended Adelson Educational Campus through the spring of 2014 and the Prentice School in October 2013. Both are private schools.

In January 2014, O.R.'s parents requested that the District reevaluate O.R. for eligibility for special education in a District program. The MDT conducted an evaluation and prepared a report on March 11, 2014. Plaintiffs provided the two Pettigru evaluations and reports for the evaluation.

The parties met for an Eligibility/IEP meeting on March 11, 2014. The MDT concluded that it did not have enough data from O.R.'s current school to determine whether she might also be eligible for special education and related services under the category of "Specific Learning Disability." The MDT concluded that O.R. was eligible under the category of "Other Health

Impairment" on the basis of her hydrocephalus diagnosis. With regard to the accommodations and modifications to be provided to O.R., the 2014 IEP included, *inter alia*, the instruction that a "multisensory approach to teaching" was to be used throughout the school day. Plaintiffs disagreed with the 2014 IEP and placed O.R. at Adelson Educational Campus, with intent to seek reimbursement.

O.R. was evaluated by Dr. Daniel DaSilva of the Morris Psychological Group of New Jersey, who prepared a neuropsychological report for the District's consideration in August 2015.

Plaintiffs contacted the District again while O.R. was at Adelson in the spring of 2016. There were two meetings in May 2016 to develop the 2016 IEP. On May 12, 2016, Plaintiffs informed the District they would continue to place O.R. at Eagle Hill, a private school, for Extended School Year and Adelson for the 2016-2017 school year unless the District proposed an appropriate program within ten business days. On May 27, 2016, Plaintiffs filed a request for a Due Process Hearing. The IEP was completed on June 8, 2016. With regard to accommodations and modifications to be provided to O.R., the 2016 IEP included, *inter alia*, "multisensory instruction that will incorporate the simultaneous use of two or more sensory pathways" during teacher presentations and student practice in Special Education classes.

Neither the 2014 nor 2016 IEP identified a specific methodology or program or structured curriculum format that teachers were obligated to utilize in meeting O.R.'s unique needs.

### a. Disputed Facts

The parties dispute whether the 2014 MDT and IEP team had sufficient information to classify O.R. as having a Specific Learning Disability, and not only as having "Other Health Impairment." Plaintiffs contend that the Pettigru evaluations established that O.R. exhibited "an unusual pattern of weaknesses in performance relative to her age and her intellectual development." ECF No. 58 at 18. The teams should have employed an alternative method available under the Nevada Administrative Code of determining O.R.'s eligibility for Specific Learning Disability, rather than rely on the "Response to Intervention" approach ("RTI"), for which the teams claimed they did not have enough data to complete. Defendant counters that the District has employed the RTI approach exclusively since 2007 and did not have the required data from O.R.'s

private school to employ that approach to determine whether O.R. had a "Specific Learning Disability."

Relatedly, the parties also dispute whether the IEP teams reviewed the Pettigru and DaSilva evaluations. Plaintiffs assert that the IHO's findings that the District's witnesses were not credible undermines their testimony that they reviewed the evaluations. By contrast, Defendant states that the SRO correctly concluded that these witnesses were credible and therefore their testimony that they considered the evaluations establishes that they did so.

Finally, the parties dispute whether the 2014 and 2016 IEPs included the components of the Orton-Gillingham approach.

## IV.    LEGAL STANDARD

### A.  Judicial Review under IDEA

"In an action challenging an administrative decision, the IDEA provides that 'the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.'" Ojai Unified Sch. Dist. v. Jackson, 4 F.3d 1467, 1471 (9th Cir. 1993) (quoting 20 U.S.C.A. § 1415(e)(2)). "Thus, judicial review in IDEA cases differs substantially from judicial review of other agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review." Id. (citations omitted). "Nevertheless, when reviewing state administrative decisions, courts must give due weight to judgments of education policy." Id. at 1472 (internal quotations and citation omitted). "Therefore, the IDEA does not empower courts to substitute their own notions of sound educational policy for those of the school authorities which they review." (internal quotations and citation omitted). "How *much* deference to give state educational agencies, however, is a matter for the discretion of the courts." Id. (quoting Gregory K. v. Longview Sch. Dist., 811 F.2d 1307, 1311 (9th Cir.1987)). "We can accord some deference to the ALJ's factual findings, but only where they are "thorough and careful . . . ." M.C. by & through M.N. v. Antelope Valley Union High Sch. Dist., 858 F.3d 1189, 1194 (9th Cir. 2017).

"[I]n most situations, due weight must be given to the final decision of the state authorities," which in a two-tiered system is that of the SRO. Amanda J. ex rel. Annette J. v. Clark Cty. Sch. Dist., 267 F.3d 877, 888 (9th Cir. 2001) (citations omitted). But "when an SRO overturns the credibility determinations of an IHO, due weight to the decision of the SRO is not warranted." Id. at 888. Thus, "in a two-tiered state administrative system due weight should be accorded to the final state determination—that of the SRO—unless the SRO's decision deviates from the credibility determination of a witness whom only the HO observed testify." Id. at 889.

### B.  Motion for Summary Judgment

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

When considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party.  Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014).

If the movant has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation marks omitted).

### V.    DISCUSSION

#### A.  IDEA Violation

##### 1.  Legal Standard

The Individuals with Disabilities Education Act ("IDEA") guarantees children with disabilities a free appropriate public education ("FAPE"). M.C., 858 F.3d at 1193 (citing 20 U.S.C. § 1400(d)(1)(A)). A FAPE is defined by the statute as special education and related services that "(a) have been provided at public expense, under public supervision and direction, and without

charge; (b) meet the standards of the State educational agency; (c) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (d) are provided in conformity with the individualized education program required under section 1414(d) of [the statute]." 20 U.S.C. § 1401. "A FAPE must be tailored to the unique needs of the handicapped child by means of an individualized educational program (IEP)." M.C., 858 F.3d at 1194.

An IEP means a written statement for each child with a disability that is developed, reviewed, and revised in accordance with 20 U.S.C.A. § 1414. That includes, *inter alia*—

> **(I)** a statement of the child's present levels of academic achievement and functional performance, including— **(aa)** how the child's disability affects the child's involvement and progress in the general education curriculum; **(bb)** for preschool children, as appropriate, how the disability affects the child's participation in appropriate activities; and **(cc)** for children with disabilities who take alternate assessments aligned to alternate achievement standards, a description of benchmarks or short-term objectives;

> **(II)** a statement of measurable annual goals, including academic and functional goals, designed to—**(aa)** meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum; and **(bb)** meet each of the child's other educational needs that result from the child's disability . . .

> **(IV)** a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child—**(aa)** to advance appropriately toward attaining the annual goals; **(bb)** to be involved in and make progress in the general education curriculum in accordance with subclause (I) and to participate in extracurricular and other nonacademic activities; and **(cc)** to be educated and participate with other children with disabilities and nondisabled children in the activities described in this subparagraph . . . .

20 U.S.C.A. § 1414.

"When formulating an IEP, a school district must comply both procedurally and substantively with the IDEA, so that the process will be informed not only by the expertise of school officials, but also by the input of the child's parents or guardians." M.C., 858 F.3d at 1194. "[A court] must determine first whether 'the State complied with the procedures set forth in the Act' and, second, whether 'the individualized educational program developed through the Act's

procedures [was] reasonably calculated to enable the child to receive educational benefits.'" Amanda J., 267 F.3d at 890 (quoting Board of Education v. Rowley, 458 U.S. 176, 206-07 (1982)). "If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." Id.

"20 U.S.C. § 1415 enumerates the procedural safeguards of the IDEA, the importance of which 'cannot be gainsaid.'" Amanda J., 267 F.3d at 891 (quoting Rowley, 458 U.S. at 205). "Procedural compliance is essential to ensuring that every eligible child receives a FAPE, and those procedures which provide for meaningful parent participation are particularly important." Id. Violation of the procedural requirements may constitute the denial of a FAPE, but mere technical procedural violations "will not render an IEP invalid." Id. at 892 (internal quotations and citation omitted). However, "procedural inadequacies that result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, or that caused a deprivation of educational benefits, clearly result in the denial of a FAPE." Id. (internal quotations and citations omitted); see also 20 U.S.C. § 1415(f)(3)(E)(ii) (2005) (stating that procedural violations may only lead to finding that a child did not receive a FAPE if they: "(I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits.")

Substantively, "[i]n order for [a child] to have received a FAPE, the IEP must have (1) addresse[d] [their] unique needs, (2) provide[d] adequate support services so [that they] can take advantage of the educational opportunities, and (3) [been] in accord with the individualized education program." M.C., 858 F.3d at 1200 (internal quotations and citations omitted).

### 2. Discussion

#### a. SRO Decision

The SRO concluded that the IHO erred because she "ignored relevant and persuasive testimony and evidence from the District, placed undue weight on the one witness presented by the appellees at the hearing, misapplied the law governing the District's duty to provide FAPE,

determined the private schools were appropriate based on scant evidence, reached beyond the notices issues in her decision, and demonstrated little knowledge of the IDEA . . . ." Ex. 1 at 18, ECF No. 1-2. Specifically, the SRO found, *inter alia*, that with regard to asserted IDEA procedural violations by the District, the IHO erred in concluding that the IEP team did not meaningfully consider the evaluations provided by Plaintiffs, thereby impeding Plaintiffs' ability to meaningfully participate in the development of the IEP. Id. at 23-35. Regarding substantive violations of the IDEA, the SRO determined that the IHO had erred in concluding that the IEPs required the inclusion of the Orton-Gillingham methodology or similar program in order to meet O.R.'s needs. Id. at 35-45. Finally, the SRO found that the IHO had erred in excluding the testimony of two District witnesses, id. at 52, and failed to apply the burden of proof when determining whether O.R.'s placement in private school was appropriate, id. at 54.

While the parties make several arguments, the primary dispute at the center of this action is whether the IEP team was required to include the Orton-Gillingham methodology, or a similar program, in O.R.'s IEP. Plaintiffs contend that O.R.'s "unique needs" require the inclusion of a program, while Defendant counters that the underlying components were included in the IEP, but that the IEP team was not obligated to name a specific methodology.

Plaintiffs argue, *inter alia*, that the SRO erred when she rejected the IHO's credibility determinations to find that the IEP teams meaningfully considered the evaluations provided by Plaintiffs and did not predetermine that they would not include a methodology in the IEPs. ECF No. 58 at 21. Defendant counters that the SRO did not err in overruling the IHO's credibility determinations because the determinations were not supported by the documentary evidence, the qualifications of Plaintiffs' expert, or the applicable statutory requirements. ECF No. 65 at 10-11.

The IHO made a number of credibility determinations to reject the assertions made by Defendant's witnesses, who included members of the MDT and IEP teams as well as those who oversaw them, that they had considered the evaluations. See Ex. 2 at 9-15, ECF No. 1-3. In particular, the IHO found that the evaluations plainly indicated that O.R.'s unique needs mandated the inclusion of a specific methodology, and because the IEPs only included "multisensory" instruction, the IEP teams could not have meaningfully considered the evaluations or Plaintiffs'

concern in accordance with their procedural obligations under the IDEA. In overturning the IHO's findings that the MDT and IEP teams did not meaningfully consider the evaluations provided by Plaintiffs, the SRO rejected the IHO's credibility determinations, finding that the testimony of the witnesses that they had considered the evaluations, coupled with the inclusion of "multisensory instruction" in the IEPS, along with the similarity between the MDT report and the independent evaluations, made it clear the IEP teams had indeed considered the evaluations as required.

### b.   The District Violated the IDEA

The Court finds that the District violated the IDEA both substantively and procedurally with respect to O.R.

The Court does not defer to the SRO's determination that the IEP teams considered the evaluations provided by Plaintiffs, because in reaching that decision, the IHO necessarily "overturn[ed] the credibility determinations" of the IHO. Amanda J., 267 F.3d at 888. Among the procedural obligations required by the IDEA is the requirement that the IEP team "review existing evaluation data on the child, including . . . evaluations and information provided by the parents of the child. . . ." 20 U.S.C.A. § 1414(c)(1)(A)(i). Another procedural obligation in developing the IEP is the requirement that the IEP team "consider . . . the concerns of the parents for enhancing the education of their child . . . ." Id. at § (d)(3)(A)(ii).

First, the Court finds that the IHO properly concluded that the IEP teams did not adequately review the evaluations provided by Plaintiffs nor meaningfully consider Plaintiffs' concerns for enhancing the education of their child. The record clearly indicates that during the development of both IEPs, Plaintiffs were not provided information regarding *any* programs provided by the District that would adequately address O.R.'s unique needs. This lack of basic and essential communication represents a procedural failure of the District apart from the identification of any particular teaching methodology. Specifically, in light of the recommendations cited in the evaluations, Defendant failed to consider "the concerns of the parents" by refusing to discuss with them during development of the IEP the types of programming provided by the District that had the capacity to address O.R.'s unique needs. O.R.'s parents had presented compelling professional evidence that was unrefuted or challenged by the District which established that O.R. required a

teaching methodology with particular facets. The District failed to provide any response to the specific needs of O.R. except to essentially say to the parents—trust us to provide her with what she needs. This is not sufficient.

The District ignored the central findings and recommendations of the professional evaluations of O.R. The evaluations did not only call for multisensory instruction. Rather, they stressed the importance of the delivery mechanism by which O.R. would receive that instruction. The 2009 Pettigru evaluation stated, "Methodology will be a key factor in improving [O.R.'s] academic standing. [O.R.] will respond best to instructional programs that provide simultaneous, multisensory instruction (VAKT), and are also systematic and cumulative." Ex. J-12 at 22, ECF No. 18. The 2013 Pettigru evaluation repeats this instruction verbatim, and additionally states that, "Unless [O.R.] has multimodality teaching, i.e., a combination of visual, auditory, tactile, and kinesthetic stimuli, she will most likely have difficulty in academic settings, especially as the academic tasks become more abstract." Ex. J-13 at 6, ECF No. 18. Dr. DaSilva's report states that "[O.R.] will continue to require intensive multimodal, research-based learning programs for reading comprehension and math." Ex. J-15 at 20, ECF No. 18. Dr. DaSilva elaborated on this recommendation in his testimony before the IHO. In response to the question as to whether it matters how the multisensory or multimodality approach is implemented, he testified that it did, that "it should be a program approach . . . there should be a methodology to it. There should be a philosophy to it and one that is applied with really rigorous consistency." Tr., Vol. III at 533:10-14, Due Process Hearings, ECF No. 18. Dr. DaSilva went on to illustrate that the provision of multiple methodologies throughout the day can result in confusion for a child, id. at 534:1-7, and that it is therefore important to ensure "the techniques are being used with consistency and fidelity throughout the day," id. at 534:8-10.

Thus, it is evident from the undisputed evaluations, which stress the importance of "methodology" and the use of "research-based learning programs," that the IEP team failed to consider the evaluations in any meaningful way. The Court is not persuaded by the SRO's finding that the documentary evidence independently supports a determination that the IEP teams considered the evaluations because they included components of Orton-Gillingham by including

the provision of "multisensory instruction." As discussed *supra*, the issue is not only the *type* of instruction but the way in which it is delivered. The professional evaluations made clear that whatever methodology used must be one directed to O.R.'s specific deficits and must be consistently and faithfully implemented. The switching of methodologies or mixing of methodologies, even if they were VAKT, would not benefit O.R. and could impede or negatively affect her educational development. While defendants are not generally required to include a methodology in the IEP, the District's own Procedures Manual makes plain that "in rare circumstances, a student's individual needs may require a certain methodology if the IEP team determines that it would be necessary for the student to receive FAPE." Ex. P-44 at 123, Due Process Hearing—Petitioner's Exhibits, ECF No. 18. Had the IEP team considered these evaluations and their recommendations as required, they would have recognized that this was one of those "rare circumstances." Similarly, the IEP teams failed to consider Plaintiffs' concerns, as the IEP teams failed to respond to their inquiries about which programs, if not Orton-Gillingham, the District was able to provide that would address O.R.'s unique needs. See Tr., Vol. IV at 711:21-23 (rejecting Defendant's attempt to call a witness who would testify as to the particular programs offered by the District because the Court "d[idn't] have any testimony that any programs were explained to the parents during the IEP meetings or at any time). Consequently, Defendant violated its procedural obligations under the IDEA.

Second, and relatedly, the Court finds that the District substantively violated the IDEA. For the reasons already stated regarding the District's procedural violation, and as the record and the evaluations make clear, O.R. required a specific methodology in order to receive a FAPE. This is not to say that she necessarily required the Orton-Gillingham methodology, but she did require an equivalent methodology that was a) research-based, b) systemic, c) cumulative, and d) rigorously implemented. The Court finds that the District did not even have any program equivalent to Orton-Gillingham in terms of offering a multimodal teaching methodology. Thus, Defendant's alleged representation about a "multisensory" program in the IEP was illusory as the District had no such program or methodology. The District did not even have the requisite knowledge, in terms of MDT, to properly identify or create a program. The record supports the

IHO's determination that no District personnel had requisite knowledge of Orton-Gillingham to determine whether their recommended IEP incorporated its specific tenets. Moreover, using only some of the specific methods in Orton-Gillingham and mixing them with other methods is precisely the type of mixing of methodologies that the Pettigru evaluation indicated would confuse and impede O.R. in her educational development.

It is evident that these procedural and substantive violations resulted in the denial of a FAPE. Not only did they "seriously infringe the parents' opportunity to participate in the IEP formulation process," but they also resulted in the loss of educational opportunity for O.R. As made plain by the evaluations and their recommendations, O.R. cannot learn without a consistent and structured approach to multisensory instruction throughout the school day. Failing to identify a methodology that would ensure that the *same* approach is consistently utilized throughout the day by *all* of O.R.'s instructors necessarily means that O.R. will not have the opportunity to learn as she needs to.

The Court grants Plaintiffs' Motion for Judgment on the Administrative Record and denies Defendant's Motion for Summary Judgment as to Count I.

### B.  Section 504 of the Rehabilitation Act

Section 504 of the Rehabilitation Act states, *inter alia*, that "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794 (2016). "Like the IDEA, section 504 applies to public schools that receive federal financial assistance." A.G. v. Paradise Valley Unified Sch. Dist. No. 69, 815 F.3d 1195, 1203 (9th Cir. 2016) (citing 29 U.S.C. § 794(b)(2)(B)). Section 504 requires federal agencies to promulgate regulations to carry out its purpose. 29 U.S.C. § 794(a). The regulation governing public education is 34 C.F.R. § 104.33, which states that, "A recipient that operates a public elementary or secondary education program or activity shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap."

"Section 504 establishes an implied private right of action allowing victims of prohibited discrimination, exclusion, or denial of benefits to seek the full panoply of remedies, including equitable relief and [compensatory] damages." Mark H. v. Lemahieu, 513 F.3d 922, 930 (9th Cir. 2008) (internal quotation and citation omitted).

"A plaintiff bringing suit under section 504 or Title II of the ADA must show: (1) she is a qualified individual with a disability; (2) she was denied 'a reasonable accommodation that [she] needs in order to enjoy meaningful access to the benefits of public services;' and (3) the program providing the benefit receives federal financial assistance. A.G., 815 F.3d at 1204 (citing Mark H. v. Hamamoto, 620 F.3d 1090, 1097 (9th Cir. 2010)). "Reasonable accommodation does not require an organization to make fundamental or substantial alterations to its programs.  Reasonableness depends on the individual circumstances of each case, and requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to enjoy meaningful access to the program. An accommodation is reasonable if it is reasonable on its face, i.e., ordinarily or in the run of cases. Mere speculation that a suggested accommodation is not feasible falls short of the reasonable accommodation requirement; the Rehabilitation Act creates a duty to gather sufficient information from the disabled individual and qualified experts as needed to determine what accommodations are necessary." Mark H., 620 F.3d at 1098 (internal quotations and citations omitted) (alterations omitted).

A plaintiff must also prove a mens rea of intentional discrimination, which may be met by showing deliberate indifference. A.G., 815 F.3d at 1204 (citing Lemahieu, 513 F.3d at 938). Under Ninth Circuit case law, "[d]eliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that . . . likelihood." Id. (internal quotation and citation omitted). "The plaintiff establishes the requisite knowledge (or notice) on behalf of the defendant when she shows that she alerted the public entity to [her] need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation)." Id. (internal quotation and citation omitted). "Thus, a public entity can be liable for damages under § 504 if it intentionally or with deliberate indifference fails to provide meaningful access or reasonable accommodation to disabled persons." Id. (citing Lemahieu, 513 F.3d at 938).

1    Plaintiffs assert that Defendant's refusal to include Orton-Gillingham or a similar

2  structured literacy program in the IEPs, despite being on notice that O.R. needed that

3  programming, constituted denial of a reasonable accommodation necessary for O.R. to receive the

4  benefit of a public education. ECF No. 58 at 25. Testimony at the evidentiary hearing established

5  that the cost of training teachers in the method is minimal and that Orton-Gillingham is efficacious;

6  therefore, it is reasonable. Id. Plaintiffs also argue that the findings of the IHO make clear that

7  Defendant teachers did not demonstrate a working knowledge of the Orton-Gillingham method

8  and that O.R. needed Orton-Gillingham or a similar method. Id. at 27. Refusal to investigate the

9  feasibility of providing Orton-Gillingham in light of explicit notice that O.R. required it amounted

10  to deliberate indifference. Id. at 27-8.

11    Defendant counters that its compliance with the IDEA means it has also satisfied the

12  requirements of Section 504 and Title II of the ADA. ECF No. 65 at 11. Furthermore, they contend

13  the record does not establish deliberate indifference for failure to include Orton-Gillingham or

14  similar programming, because evidence available to the IEP teams at the time indicated the

15  provision of these programs was not a reasonable accommodation, since research was not settled

16  on the efficacy of Orton-Gillingham. Id. (citing Inst. Of Educ. Sciences, What Works

17  Clearinghouse, Orton-Gillingham-based Strategies (Unbranded) (July 2010),

18  https://ies.ed.gov/ncee/wwc/Docs/InterventionReports/wwc_ortongill_070110.pdf).

19    The parties do not dispute that O.R. is a qualified individual with a disability or that the

20  District receives federal financial assistance. The Court's analysis above regarding the IDEA claim

21  illustrates that O.R. needed a methodology in order to "enjoy meaningful access" to a public school

22  education.

23    The Court finds that the record establishes that failure to offer the Orton-Gillingham

24  methodology or an equivalent methodology was unreasonable. The testimony at the evidentiary

25  hearing established that training in the Orton-Gillingham method requires one week of full training

26  at a cost of between $1,500 and $2,000, after which the trainee must complete a practicum of

27  thirty-six to sixty hours of supervised one-on-one time with a student at an additional cost, that

28  may be completed up to a year after the training. ECF No. 57 at 31-33. The Court finds that the

cost and time required for this training does not constitute a "fundamental or substantial alteration" to Defendant's programming.[1] Moreover, as to the efficacy of Orton-Gillingham, the Court finds that Defendant's own expert acknowledged that Orton-Gillingham and Lindamood-Bell, another program indicated for students with dyslexia, are accepted methodologies for addressing issues of dyslexia. The Court further finds that the record establishes that Orton-Gillingham came into practice in the 1950's and has been successfully implemented throughout the United States. The record further establishes that this training and the associated methodologies would have benefited many other students, including those with dyslexia, and could have been easily disseminated throughout the District using "train the trainer" sessions.

Finally, the Court finds that the record establishes Defendant's deliberate indifference. Plaintiffs notified Defendant of O.R.'s need for the identification and implementation of a methodology, and Defendant failed to act despite knowing that O.R. would be deprived of educational opportunity without adequate programming. The IHO found in part that Defendant's witnesses "did not demonstrate a working knowledge of the Orton-Gillingham Method," and therefore could not have adequately ensured that the IEPs contained components of the program. ECF No. 1-3 at 14. The Court has already indicated, *supra*, that it finds this conclusion to be supported by the record in this case. Moreover, as the Court has already noted, O.R. required more than mere components. She required the implementation of consistent programming throughout the day. The IEP teams' failure to recognize this, despite having notice in the form of recommendations provided in the evaluations and discussion with O.R.'s parents, demonstrates deliberate indifference. The record therefore establishes that Defendant violated Section 504 of the Rehabilitation Act.

Accordingly, the Court grants Plaintiffs' Motion for Judgment on the Administrative Record and denies Defendant's Motion for Summary Judgment as to Count II.

## C.  Title II of the ADA

---

[1] Indeed, it appears that the District found it appropriate to provide such training in the context of this litigation, possibly to avoid a negative outcome. ECF No. 57 at 58:1-19. It appears to have done so timely. This further supports the Court's finding of the reasonableness of the accommodation.

"Title II of the ADA, the title applicable to public services, provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, *or be subjected to discrimination by any such entity*,' and requires that the DOJ promulgate regulations to implement this provision." K.M. ex rel. Bright v. Tustin Unified Sch. Dist., 725 F.3d 1088, 1096 (9th Cir. 2013) (quoting 42 U.S.C. §§ 12132, 12134); see also 28 C.F.R. § 35.130(a). "[P]ublic schools are among the public entities governed by Title II." K.M., 725 F.3d at 1097.

"Although Title II is different from section 504 in several respects . . . the elements of a valid Title II claim do not differ in any material sense from those of a valid section 504 claim and the two may be addressed together." A.G., 815 F.3d at 1203–04; see also Martin v. California Dep't of Veterans Affairs, 560 F.3d 1042, 1047 n.7 (9th Cir. 2009) ("Because '[t]here is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act,' we have consistently applied 'the same analysis to claims brought under both statutes,' and again do so here." (internal citations omitted)). However, unlike Section 504's deliberate indifference standard, "Title II's prohibition of discrimination or denial of benefits 'by reason of' disability establishes a 'motivating factor' causal standard for liability when there are two or more possible reasons for the challenged decision and at least one of them may be legitimate." K.M., 725 F.3d at 1099. Consequently, "if the evidence could support a finding that there is more than one reason for an allegedly discriminatory decision, a plaintiff need show only that discrimination on the basis of disability was a 'motivating factor' for the decision. By contrast, [t]he causal standard for the Rehabilitation Act is even stricter, requiring a plaintiff to show a denial of services solely by reason of disability." Id. (internal quotations and citations omitted).

Accordingly, as both the Section 504 and Title II claims do not differ and the Court has already found that Defendant's conduct satisfied the stricter *mens rea* standard of deliberate indifference under the Section 504 claim, the Court incorporates its reasoning as to the Section 504 claim to find that Defendant violated Title II of the ADA. Consequently, the Court grants Plaintiffs' Motion for Judgment on the Administrative Record and denies Defendant's Motion for Summary Judgment.

### D.  Reinstatement and Reimbursement

Plaintiffs request that the Court reinstate the IHO's award of tuition and transportation reimbursement. They also request reimbursement of expenses above and beyond the IHO's award, which they contend they are entitled to under the "stay put" provisions of 20 U.S.C. § 1415(j), and in light of a balancing of the equities.

As stated above, on November 14, 2016, the IHO found that the District failed to provide O.R. with a FAPE. The IHO determined that Plaintiffs were entitled to tuition and transportation reimbursement for O.R.'s time at the Prentice School and Adelson Campus from June 2014 through the 2016-2017 school years. In total, the IHO awarded Plaintiffs **$63,334.30**. ECF No. 1-3 at 36. Plaintiffs allege that the IHO's decision resulted in a change in placement which vested O.R. with "stay put rights" in "a placement that could provide structured literacy programming to meet her needs" through the pendency of this appeal. Accordingly, they request reimbursement of all expenses associated with placing O.R. in the appropriate schools that could meet her needs, up through the 2020-2021 school year.

Plaintiffs request reimbursement for tuition and bus transportation at Adelson from 2017-2018 in the sum of **$23,150.00**. ECF No. 74-1 at ¶ 7. Further, Plaintiffs allege that after the 2017-2018 school year, Adelson could no longer meet O.R.'s needs, and so Plaintiffs were forced to find another school that could provide O.R. with the structured literacy programming she required. Plaintiffs allege that they were unable to locate an appropriate school within commuting distance from their home in Las Vegas, and as a result, they sent O.R. to the Purnell School in Pottersville, New Jersey, for the 2018-2019, 2019-2020, and 2020-2021 school years. Plaintiffs request reimbursement in the sum of **$267,874.42** for tuition and travel expenses arising from enrollment at the Purnell School. ECF No. 74-1 at ¶ 10.

Plaintiffs also request a number of other reimbursements arising from other schooling, summer camp programming, psychological services and educational testing, teacher training, and associated transportation costs. Plaintiffs argue that such reimbursement is proper because the failure to provide a FAPE is not limited to traditional schooling, but also covers related services— including counseling, psychological services, speech and language services, and assessment

procedures—that are ordinarily free of cost within the context of a FAPE. Accordingly, Plaintiffs request reimbursement for the following:

 (a) Summer tuition, summer speech and language sessions, and associated travel expenses for the Eagle Hill School in Hardwick, Massachusetts, during the summers of 2014-2017, totaling **$52,196.70**. ECF No. 74-1 at ¶ 6.

 (b) Costs for counseling services, teacher counseling and training, psychological services in the form of consulting with other staff members in planning programs for O.R., and tutoring services, totaling $**34,460.20**. ECF No. 74-1 at ¶ 11.

 (c) Expenses arising from various psychological services, including administering psychological and educational tests and other assessments on O.R., and interpreting assessment results, totaling $**15,975.00**. ECF No. 74-1 at ¶ 12.

  Finally, while the IHO only established that Plaintiffs were entitled to reimbursement for expenses associated with the Prentice School beginning in June 2014, Plaintiffs contend they incurred expenses beginning with the start of the 2013-2014 school year, totaling **$51,720.74**. ECF No. 74-1 at ¶ 4. Plaintiffs identify expenses arising from tuition, tutoring, and speech therapy, as well as from costs of living—such as rent, utilities, groceries, home furnishings, and nanny, housekeeper, and babysitter expenses. Plaintiffs argue that reimbursement back to 2013 is appropriate because they sought reevaluation of O.R. as early as January 2, 2014, and they provided the District with notice of their intent to seek reimbursement as early as March 17, 2014. They further allege that when parents are unable to locate appropriate programming locally, they are entitled to reimbursement for lodging or residential programming and related costs. They argue that the costs of living associated with their time at the Prentice school—going back to 2013—should thus be reimbursed. Plaintiffs' total reimbursement request amounts to **$506,482.06**. ECF No. 74-1 at ¶ 13.

  Defendant rejects Plaintiffs' contention that the IHO decision effectively changes the pendency placement of O.R. to the private school she was unilaterally placed in. Defendant counters, without any reference to controlling law, that the current educational placement "is the last IEP that was not disputed by the parties," and thus, the pendency placement should be based

on the December 2007 IEP. Defendant further argues that the record does not support a finding that the Prentice or Purnell private school placements are reasonable or appropriate. Finally, Defendant contends that Plaintiffs' requests for reimbursement of additional tutoring, apartment rental, utilities and furnishings, and costs associated with groceries, housekeepers, and babysitters are unreasonable.

The Court finds that Plaintiffs' unilateral placement suffices as the "current educational placement" for the purposes of reimbursement. 20 USC § 1415(j) provides that during the pendency of IDEA proceedings, "unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child." When the child's parents seek a unilateral change in placement and move their child from an IEP-specified program to an alternative setting, the parents are initially responsible for bearing the costs of the child's new placement. The State may become responsible for reimbursing those costs, however, if a later administrative review process determines that the alternative placement is reasonable and appropriate for the child. See Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 372 (1985) (stating that an administrative decision in favor of the parents' private school placement "would seem to constitute agreement by the State to the change of placement"); Douglas v. Cal. Off. Of Admin. Hearings, 540 Fed. Appx. 312, 315 (9th Cir. 2016) ("If 'a State review official in an administrative appeal agrees with the child's parents that a change of placement is appropriate, that placement must be treated as an agreement between the State and the parents for the purposes of the stay put provision (quoting 34 C.F.R. § 300.518(d))).

Here, the IHO rendered an administrative decision in Plaintiffs' favor, thereby constituting an agreement by the State to change placement. Further, as Plaintiffs note, it would be unreasonable to set the "stay put" placement based on the December 2007 IEP, as Defendant requests. In 2007, O.R. was five years old and placed in a self-contained preschool in the District; by the time this Court heard oral argument on Plaintiffs' right to reimbursement, O.R. was a senior in high school bound for college. Fixing the December 2007 IEP as the proper "stay put" placement defies reason and offends the IDEA's principal interest in placing disabled children in their appropriate educational settings.

Further, reimbursement under the "stay put" placement protections survives the pendency of appeal. See Joshua A. v. Rocklin Unified Sch. Dist., 559 F.3d 1036, 1040 (9th Cir. 2009) (stating that the protections of the "stay put" provision reflect Congress's intent to protect disabled children from the "irreparable harm inherent in the premature removal . . . to a potentially inappropriate educational setting"); M.R. v. Ridley Sch. Dist., 744 F.3d 112, 124 (3rd Cir. 2014) (stating that a student secured the right to reimbursement through the pendency of appeal when the hearing officer ruled in her favor, notwithstanding the district court's reversal of the administrative decision). As such, the proper placement—as determined by the IHO—survived the SRO's reversal. Plaintiffs are thus entitled to reimbursement for costs associated with enrollment at Adelson between 2017-2018.

The Court further agrees with Plaintiffs that the equities favor a finding that O.R.'s "stay put" placement is now Purnell. Under the IDEA, the Court has the inherent equitable authority "to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement . . . is proper under the Act." Florence Cty. Sch. Dist. Four v. Carter ex rel Carter, 510 U.S. 7, 12 (1993). Plaintiffs submitted uncontroverted evidence that Purnell provides the required Orton-Gillingham programming necessary for O.R. to receive a FAPE. Purnell was not addressed during the administrative process because it *could not have been*; at the time, Adelson met O.R.'s needs and Plaintiffs had no reason to enroll O.R. at Purnell. Indeed, after learning that O.R. could not return to Adelson after the 2017-2018 school year, Plaintiffs first approached Defendant with the offer to pay to train the District's employees to provide structured literacy programing to O.R., and Defendant refused. Plaintiffs looked for schools within the area but could not find a program that would meet O.R.'s needs. Defendant cannot now argue that Plaintiffs are barred from seeking reimbursement for a school that provided the requisite programming for O.R., when it had the opportunity—at minimal cost—to implement that programming in-district. This Court determines that the equities favor a finding that Purnell is O.R.'s current "stay put" placement.

The Court next addresses Plaintiffs' other requests for reimbursement. First, with respect to the Eagle Hill School, the Court finds that Plaintiffs are entitled to reimbursement totaling

1  **$52,196.70**. The IHO found that it could not award relief to Plaintiffs for the costs incurred in

2  relation to the Eagle Hill School, because no testimony was provided describing the academic

3  program at Eagle Hill and whether it provided O.R. with the requisite programming to constitute

4  a FAPE. Plaintiffs have since supplemented the record with regards to this issue; namely, by

5  attesting that Eagle Hill provided structured literacy instruction to O.R. Further, Plaintiffs seek

6  reimbursement for Eagle Hill as damages pursuant to Section 504 and Title II of the ADA.

7  Compensatory damages are available under both Title II of the ADA and Section 504 of the

8  Rehabilitation Act. Lemahieu, 513 F.3d at 930; Ferguson v. City of Phoenix, 157 F.3d 668, 674

9  (9th Cir. 1998). As stated above, Plaintiffs have satisfied both the "deliberate indifference"

10  standard for the purposes of establishing liability under § 504, and the "motivating factor"

11  requirement for establishing liability under Title II. As such, Plaintiffs are entitled to compensatory

12  damages to cover the costs of tuition and travel expenses for O.R.'s enrollment at Eagle Hill

13  School.

14      Next, the Court finds that Plaintiffs are entitled to the costs associated with counseling

15  services, teacher counseling and training, psychological services in the form of consulting with

16  other staff members in planning programs for O.R., and tutoring services. See ECF No. 74-1 at ¶

17  11. A "free appropriate public education" includes "special education and related services," and

18  related services are defined to include:

19
20
21
22
23
24
25
        such developmental, corrective, and other supportive services
        (including speech-language pathology and audiology services,
        interpreting services, psychological services, physical and
        occupational therapy, recreation, including therapeutic recreation,
        social work services, school nurse services designed to enable a
        child with a disability to receive a free appropriate public education
        as described in the individualized education program of the child,
        counseling services, including rehabilitation counseling, orientation
        and mobility services, and medical services, except that such
        medical services shall be for diagnostic and evaluation purposes
        only) as may be required to assist a child with a disability to benefit
        from special education . . . .

        20 U.S.C. § 1401 (emphasis added).

26

27  Plaintiffs specifically request reimbursement for various cognitive and behavioral therapies, social

28  skills therapies, speech therapies, and tutoring services provided to O.R. These services plainly

1    fall within the "related services" covered by a FAPE. This Court further grants Plaintiffs' request

2    for reimbursement for the Orton-Gillingham trainings and other methodological trainings that

3    Plaintiffs had to provide to teachers at schools outside of the District. See ECF No. 74-1 at ¶ 12.

4    Had O.R. been provided a FAPE within the District, these expenses would not have been incurred;

5    and as stated earlier, Plaintiffs even offered to pay the District for these trainings before seeking

6    options elsewhere.

7          Finally, the Court does not find that Plaintiffs are entitled to reimbursement for the

8    outstanding alleged expenses associated with the Prentice School beginning in 2013. See ECF No.

9    74-1 at ¶ 4. The IHO properly limited reimbursement based on the date that Defendant offered

10   Plaintiffs an IEP. Further, the cases cited by Plaintiffs in support of reimbursement for costs of

11   rent, groceries, furnishings, and childcare are inapplicable here, as those cases involved residential

12   schools; here, there is no suggestion that the Prentice School was a residential program. Further,

13   those cases did not sweep so broadly—while the parents in those cases were reimbursed for the

14   cost of boarding and food, here Plaintiffs request reimbursement for airport parking, nannies,

15   housekeepers, and babysitter expenses incurred in Nevada while Plaintiffs were out-of-state with

16   O.R. The Court finds reimbursement of those costs to be unreasonable.

17         In sum, the Court orders that the IHO's decision and reimbursement calculation be

18   reinstated (**$63,334.30**). ECF No. 1-3 at 36. The Court also finds that Plaintiffs are entitled to

19   reimbursement for enrollment at Adelson from 2017-2018 (**$23,150.00),** ECF No. 74-1 at ¶ 7, as

20   well as enrollment at Purnell through the end of the 2021 school year (**$267,874.42**), ECF No. 74-

21   1 at ¶ 10. The Court further orders that Plaintiffs are entitled to reimbursement for summer tuition,

22   summer speech and language sessions, and associated travel expenses for the Eagle Hill School

23   during the summers of 2014-2017 (**$52,196.70**). ECF No. 74-1 at ¶ 6. Finally, the Court orders

24   that Plaintiffs be reimbursed the cost of all related services (**$50,435.20**). ECF No. 74-1 at ¶¶ 11-

25   12. Defendant shall reimburse Plaintiffs in the sum of **$456,990.60.**

26   . . .

27   . . .

28   . . .

## VI.     CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Judgment on the Administrative Record, as Supplemented (ECF No. 58) is **GRANTED** and Defendant's Motion for Summary Judgment (ECF No. 59) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant shall reimburse Plaintiffs in the sum of **$456,990.60.** The Clerk of Court shall enter judgment accordingly and close this case.

DATED October 12, 2021.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**